ZAPMEDIA SERVICES, INC.             §
                                    §
vs.                                 §          CASE NO. 2:08-CV-104-DF-CE
                                    §
APPLE INC.                          §

## MEMORANDUM OPINION AND ORDER

After considering the submissions and the arguments of counsel, the court issues the following order concerning the claim construction issues:

## I.     Introduction

In this case, the plaintiff Zapmedia Services, Inc. ("Zapmedia") contends that the defendant Apple Inc. ("Apple") infringes various claims of United States Patent Nos. 7,020,704 ("the '704 patent") and 7,343,414 ("the '414 patent"). This memorandum addresses the parties' various claim construction disputes. The court will first briefly address the technology at issue in the case and then turn to the merits of the claim construction issues.

## II.    Background of the Technology

The two patents asserted in this case relate to similar subject matter. The '414 patent is a continuation of the '704 patent. The '704 patent is titled "System and Method for Distributing Media Assets to User Devices via a Portal Synchronized by Said User Devices." The title of the '414 patent is "System and Method for Distributing Media Assets to User Devices and Managing User Rights of the Media Assets." The invention is described generally in the '704 and '414 patent specifications:

> Briefly, the present invention is directed to a system and method for distributing digital media assets to a plurality of users. A portal is provided comprising at least one server computer. The portal executes a media library database server application

that manages access to a master library of media assets that can be accessed by users via one or more communication networks. Each of a plurality of media player devices communicates with the portal to access media assets for use. Each media player device assists in managing media assets licensed for use by a user.

('704 patent, 1:33-42).

## III.    General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (quoting *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)). Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. 35 U.S.C. § 112; *id.* at 978. A patent's claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec.*

*Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)) (emphasis added). To that end, the words used in a claim "are generally given their ordinary and customary meaning." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. *Id.* The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."

*Phillips*, 415 F.3d at 1313. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. The Supreme Court stated long ago that "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. *Id*. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id*.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. *Id*. The *en banc* court

condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21 (quoting *Vitronics*, 90 F.3d at 1582). According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that "[t]he patent system is based on the proposition that the claims cover only the invented subject matter." *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. *Phillips*, 415 F.3d at 1322. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. *Id.* at 1317-19. In doing so, the court emphasized that claim construction issues are not resolved by any "magic formula." *Id.* at 1324. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. *Id.* at 1324.

## IV.     Agreed Terms

The parties have agreed to constructions of the following terms:

- "reference to" means "an identification of"

- "providing a user with a user account" means "creating a user account for a user"

- "reference to" / "references to" means "identification of"

- "a server database application" means "a software database application that runs on a server"

- "associated with the user account" means "having a recorded relationship with the user account"

- "a server application accessible over a network and capable of recognizing" means "software used by 'a server,' which can be accessed over a 'network,' and which is capable of perceiving or acknowledging"

- "wherein the number of authorized media player devices are limited to a maximum number" means "the amount of authorized media player devices are confined or restricted to a predefined upper limit"

- "limit which of the plurality of media assets may be accessed by the at least one authorized media player device" means "confine or restrict which media assets may be accessed by an authorized media player device"

- "associating the licensed plurality of media assets with the user account" means "making a record of a relationship between the user account and the plurality of media assets"

- "media assets which the user has a license to use" and "licensed plurality fo media assets" mean "those assets to which a user has purchased digital access rights on one or more media players."

## V.     Disputed Terms

### A.     "media asset"

The preamble of each of the asserted claims contains the term "media asset." For example, the preamble of the '704 patent, claim 7 states, "A *media asset* management system comprising," and the preamble of the '414 patent, claim 1 states, "A method of managing access to a plurality of *media assets* comprising the steps of." The term "media asset" is used throughout the specification. (*E.g.*, '704 patent, 3:35-45 ("The digital *media assets* distributed by the system [] may be audio such as music, video such as movies, television programs or other video productions, interactive software games, or any media that is digitized and suitable for electronic distribution. The digital *media assets* may be in any known or hereinafter developed formats . . . .") (emphasis added)). The plaintiff contends that the term "media asset" means "any media that is digitized and suitable for electronic distribution," while the defendant contends that the term means "an item, such as a digital file or a computer disk, that contains digital or analog media."

Zapmedia argues that "media assets" are limited to digital media and do not include analog formats. According to the plaintiff, the phrase "digital media assets" appears in the specification twenty-five times, but "analog" is never used with the term "media asset." Additionally, both the Abstract and Summary of the Invention describe the invention as "a system and method for distributing *digital* media assets." ('704 patent, 1:33-34) (emphasis added). In response, Apple argues that the ordinary meaning of "media asset" is not limited to digital assets. Furthermore, the specification uses both "digital media asset" and "media asset," so the patentee wishes to distinguish between the terms. Finally, according to Apple, the specification refers to "physical media assets," which are not necessarily digital.

Based upon the use of "media asset" in the specification and claims, this invention is limited

to digital formats only. Therefore, the court construes "media asset" to mean "any media that is digitized and suitable for electronic distribution."

**B.      "portal"**

The term "portal appears in claim 7 of the '704 patent: "A media asset management system comprising: a *portal* comprising: a user account . . . a virtual media asset library . . . and a plurality of media player devices." The Abstract describes the portal as shown below:

> A portal is provided comprising at least one server computer. The portal executes a media library database server application that manages access [to] a master library of media assets that can be accessed by users via one or more communication networks. A plurality of media player devices communicate with the portal to access media assets for use.

According to the patents' written description, "[t]he portal [] communicates with media player devices [] via communication network [] that may consist of the Internet and/or a combination of wireless communication networks, such as cellular networks, PCS networks, etc." ('704 patent, 3:48-51). The plaintiff's proposed definition is "a computer server or group of servers accessible over the Internet and allowing the storage, stream and download of media assets to a media player." Alternatively, Zapmedia contends that "portal" means "a main screen/page serving as an opening or gateway through which other screens/pages are accessed." Apple assets that the term should be construed as "a site serving as a guide or point of entry to the World Wide Web."

The plaintiff asserts that its proposed construction closely tracks the Abstract and written description, quoted above. The defendant responds that its construction is consistent with the ordinary meaning of the term "portal." *E.g.*, Computer Dictionary Online, at "portal" ("a web site that aims to be an entry point for the World Wide Web"). Apple also contends that its construction is supported by Figure 4 of the '704 patent, which is "[a]n example of a web site home page through which a user interacts with the portal." ('704 patent, Fig. 4 & 3:61-63). Finally, Apple argues that

the prosecution history precludes a broad definition of "portal."  In distinguishing the Milsted reference to the PTO, the applicants argued, "The communicating, downloading, or distributing media assets as described in Milsted is the purchasing, downloading, and receiving of media assets from a media asset provider, . . . rather than from a portal, to a media player device for utilization by a user."  (Dkt. No. 84, Ex. O, at 11).

The court is not persuaded that Apple's narrow construction of "portal" is correct. Dictionary definitions of a claim term are subordinate to the meaning provided by the patent's specification.  *Phillips*, 415 F.3d at 1316.  Furthermore, the specification does not limit the portal to communications solely over the World Wide Web.  (*See* '704 patent, 3:29-32 ("The portal 300 *may* be accessible . . . through one or more web sites and *may* provide a customizable interface or view to each user, *if desired*.") (emphasis added)).  Even if the specification does mention the portal being accessed over the World Wide Web, there is no express reason to limit the scope to the preferred embodiment.  *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907-08 (Fed. Cir. 2005) (stating that "[c]laims of a patent may only be limited to a preferred embodiment by the express declaration of the patentee").  Finally, the prosecution history distinguishes the Milsted and Reed references, not based upon distribution of media assets to media players, but on bi-directional synchronization:

> One function of the present invention is *to synchronize* the media assets available on the server and the media player devices in a *bi-directional manner. . . . Thus, in utilizing a one-way communication, Reed teaches away from the present invention*. As amended, independent claims 1 and 25, on the other hand, describe a two-way synchronization between a portal and a media player device. . . .  Thus, changes to any of the assets on any media player device are updated to the portal and changes to any of the assets on the portal are updated to all media player devices . . . . Therefore, Milsted alone, nor Milsted in view of Reed do not [anticipate] nor make obvious . . . synchronization between a client and a server application so that the database stores and updates information identifying media assets that a user has licensed user rights.

9

(Dkt. No. 84, Ex. O, at 11-12) (emphasis added). This functionality of the portal is also described in the specification: "The portal 300 allows for synchronization and replication of a user's licensed assets with each of the user's media player devices 200." ('704 patent, 3:22-24).

As to Zapmedia's proposal, nothing in the specification or the claims limits the communication medium to solely the Internet. (*See* '704 patent, 3:48-51 ("The portal [] communicates with media player devices [] via communication network [] that may consist of the Internet and/or a combination of wireless communication networks, such as cellular networks, PCS networks, etc.")). Also, as discussed above, the prosecution history explicitly disclaimed uni-directional synchronization. Therefore, the court construes the term "portal" to mean "a computer server or group of servers that stores media assets and transmits and receives media assets to and from media players over a communications network."

C.      "a server"

"A server" is found in the '414 patent, claim 4: "A media asset management system comprising: *a server* comprising: a user account . . . a server database application . . . ; and a server application . . . ." The plaintiff contends that "a server" means "one computer server or a group of computer servers, where each computer server is a computer used to provide services (such as stored data or files, processing power, or management of network resources) to other computers or devices in a network." According to the defendant, "a server" should be construed as "a computer or device on a network that manages network resources."

The plaintiff argues that "a server" should not be limited to a single server, but may mean one or more servers. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention."). But Apple points out that the claim language requires the

server to have specified features, and these requirements are not satisfied by one or more servers collectively having those features. *See Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1228 (Fed. Cir. 2004) (holding that the limitation "*a light spot*" requires a single light spot, not a combination of light spots). Therefore, while an accused system may have multiple servers, each server must independently be capable of performing all of the limitations listed in the claim language.

Next, Apple proposes a dictionary definition that includes "manages network resources." There is no need for the servers in this context to manage network resources. Thus, the court construes "a server" as "one or more computers or devices on a network, with each computer or device having user account(s), server database application(s), and server application(s)."

### D. "user account"

The term "user account" appears in several claims, e.g., "a *user account* corresponding to at least one user" ('704 patent, claim 7); "providing a user with a *user account* . . . associating the licensed plurality of media assets with the *user account* . . . authorizing over a network a plurality of media player devices with the *user account*." ('414 patent, claim 10). "User account" is described in the specification as follows: "Initially, a user becomes a member or subscriber to a portal . . . . Once a membership exists, a virtual private media asset database is created and associated with the *user's login account* and password in the portal." ('704 patent, 10:25-27) (emphasis added). According to the plaintiff, this term means "a record stored in system memory indicating that the user has the right to access a system for managing media assets, and one or more media player devices that may access referenced media assets." Apple argues that the definition should be "a user's membership record in a portal/server that specifies the plurality of media player devices that may access the referenced media assets." The parties' proposed constructions differ in two ways: (1) whether the account must exist in the portal/server or in system memory; and (2)

whether the account must specify the media player devices.

Apple argues that the patent neither describes nor enables a user account anywhere but the portal or server. The Summary of the Invention states, "The portal executes a media library database server application that *manages access* to a master library of media assets that can be accessed by users . . . ." ('704 patent, 1:36-38). Thus, the portal provides the access control functionality, and that access control is based upon the rights assigned to user accounts. ('704 patent, 3:25-28 ("The portal 300 also serves as a central repository within which media assets are 'tagged' with identity and access privileges of those users . . . .")). In response, Zapmedia argues that the location of the user account is unimportant, and the term should not be limited to a disclosed preferred embodiment–user account on the portal. Claim 10 of the '414 patent describes "providing a user with a user account," but nowhere in the claim is a server or portal disclosed; thus, user accounts are not always tied to a portal or server. Additionally, some of the claims specify that the account resides on the portal or server, so adding a location requirement in the construction would be superfluous. As such, the user account is not required to be on the portal or server.

Next, according to Apple, the user account must specify *all* of the media player devices, not merely some, permitted to access that account's media assets. In support of its proposal, the defendant cites the '704 patent's prosecution history, which states, "The user account specifies the plurality of media player devices that may access the media assets." (Dkt. No. 84, Ex. L, at 11). Zapmedia responds that Apple's proposed construction precludes user accounts that have only one media player device. Zapmedia also contends that the specification describes accounts with one or more associated devices. ('704 patent, 10:15-16 ("[E]ach account on the portal has one or more media player devices associated with it . . . .")). The claim language, however, refers to a "plurality of media player devices." As such, the "one or more" versus "plurality" argument does not have to

be resolved in the context of the "user account." In all, the court construes the term to mean "a record indicating that the user has the right to access the media assets, and indicating which media player devices may access referenced media assets."

E. **"virtual media asset library"**

Claim 7 of the '704 patent states in part: "*a virtual media asset library* for storing a reference to a plurality of media assets" and "a media asset portability application that enables the user to access the plurality of media assets referenced in the *virtual media asset library*." Apple argues that "virtual media asset library" should be defined as "the functionality at the portal that allows for synchronization and replication of a user's licensed assets with each of the user's media player devices." In support of its construction, Apple points to the following passage from the specification: "The portal [] allows for synchronization and replication of a user's licensed assets with each of the user's media player devices []. This functionality is hereinafter referred to as the *virtual media asset library*." ('704 patent, 3:22-25) (emphasis added). According to Apple, the specification explicitly defines "virtual media asset library," and as such, that definition controls. *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009); *Philips*, 415 F.3d at 1321.

Zapmedia contends that this term means "a collection of 'media assets' as data files." According to Zapmedia, the ordinary meaning of asset library relates to storage, not synchronization and replication. The plaintiff also contends that the specification provides an alternative definition of "virtual media asset library": "The user's *virtual media asset library* represents an intersection of the media assets in the master media library database [] and those assets that the user has licensed rights to." ('704 patent; 10:53-56) (emphasis added). Finally, Zapmedia argues that in the context of the claim language, i.e., "a virtual media access library for *storing*," this term refers to a

13

repository, not software functionality.

Based upon the specification and claims, "virtual media asset library" is described as having two distinct characteristics. Therefore, the court defines this term as "a repository of media assets to which the user is licensed and functionality that allows synchronization and replication of the user's licensed assets with each of the user's media player devices."

**F.** **"a plurality of media player devices associated with the user account" / "a plurality of media player devices as being authorized with the user account"**

This disputed term appears in claim 7 of the '704 patent: "A media asset management system comprising: . . . *a plurality of media player devices associated with the user account*. . . ." Likewise, claim 4 of the '414 patent states, "A media asset management system comprising: . . . a server application accessible over a network and capable of recognizing *a plurality of media player devices as being authorized with the user account* . . . ." Zapmedia believes that this term means "two or more 'media player devices' associated with the user account." Alternatively, Zapmedia contends that the term should be defined as "two or more media players specified in the user account, whereby referenced media assets can be copied and/or used by the aforementioned media players." The defendant's proposed construction is "a set of two or more permitted media players that are specified in the user account, whereby referenced media assets can be copied and used exclusively by media players in the set."

The primary difference between the plaintiff's alternative definition and the defendant's definition is whether the associated or authorized media player devices are the "exclusive" set of media players that may copy and use media assets. Apple argues that prosecution disclaimer prevents Zapmedia from contending that the associated or authorized set of media players is non-exclusive. In distinguishing the Milsted reference, the applicants pointed to the "associate a

14

plurality of media player devices with the user account" limitation. (Dkt. No. 84, Ex. F, at 6). According to Apple, the following statements to the PTO distinguish Milsted on the basis that Milsted did not require an exclusive set of media player devices:

- "And although Milsted does indicate that assets can be copied to another player device, the use of the asset is governed by licensing rights that are embedded in the asset itself *without regard to the device being associated with the user account*." *Id.* at 7 (emphasis added).

- "Rather than associating the end user devices with a user account as recited in claim 84, Milsted describes embedding usage conditions within an asset. Thus subject to the usage conditions, *the assets can be copied and used by ANY player device, not a subset of player devices that are associated with a user account*." *Id.* at 8 (emphasis added).

- "[T]he media assets are referenced in the media asset library associated with a particular user account. The user account specifies the plurality of media player devices that may access the media assets." (Dkt. No. 84, Ex. L, at 11).

In response, Zapmedia asserts that there was no "clear and unmistakable" disavowal of access by media player devices not associated with the user account. *See Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). The plaintiff admits that the patentees distinguished Milsted on the basis that the Milsted prior art did not teach the association of media player devices with a user account. But, according to Zapmedia, the patentees did not disclaim prior art methods of media asset distribution, such as taught in Milsted. In one of the responses to a PTO rejection, upon which Apple relies, the patentees state, "Although the embodiments that are covered by claim 84 do not preclude technology such as described in Milsted, the applicants point out that the Milsted reference does not disclose the invention as recited in claim 84 . . . ." (Dkt. No. 84, Ex. F, at 8). This statement indicates that the patentees did not disclaim the prior art, but merely

distinguished Milsted from their improvement. Zapmedia argues that the '414 and '704 patents teach a hybrid of the prior art DRM techniques (watermarking, encryption, encapsulation) and the allegedly novel registration/authorization of media player devices. (*See* '704 patent, 11:28-31 ("The system and method of the present invention optionally allow for security against asset piracy by one or more methods: watermarking, encryption, and object encapsulation.")). In support of this argument, Zapmedia points to the following passage from the specification:

> Furthermore, with the permission of a digital media asset owner or licensor, a user may be granted the right to loan or forward his or her licensed media assets to another person that is not a registered user of the system. The forwarded asset is encapsulated in an executable file that allows for the object's integration into the recipient's media players . . . .

('704 patent, 11:61-66). Thus, the media players associated with the user account are not the *exclusive* set of media players that are permitted to access the media assets. As such, the court construes the terms "a plurality of media player devices associated with the user account" and "a plurality of media player devices as being authorized with the user account" to mean "two or more media players specified in the user account, whereby referenced media assets can be copied and/or used by the aforementioned media players."

### G. "the plurality of media player devices including a media asset portability application"

Claim 7 of the '704 patent requires "a plurality of media player devices associated with the user account, *the plurality of media player devices including a media asset portability application that enables the user to access the plurality of media assets referenced in the virtual media asset library.*" "Media asset portability application" is not found in the specification. The plaintiff recommends that this term should be construed as "two or more 'media player devices' with software permitting a 'media asset' to be copied or moved." On the other hand, the defendant's

16

suggested construction is "each of the media player devices has a software program that allows the media player user to access files stored at the portal in the user's virtual media asset library."

The parties' two primary disagreements are (1) can media player devices transfer media assets directly to other media assets or are they limited to transferring directly to and from the portal; and (2) is each media player device required to run the media asset portability application. First, Apple argues that the media asset portability application is limited to transfers between the media player device and the portal. According to the defendant, the specification contains no references to direct transfers of assets between media player devices. As to the claims themselves, Apple contends that the language of claim 7 mentions nothing about direct transfer of assets from device to device.

In response, Zapmedia notes that the specification discusses watermarking a media asset to associate the asset with a user's family of media devices. ('704 patent, 11:37-42). The specification goes on to explain, "[T]he user will have access to those assets from one client media player device to another in *seamless fashion*. This example illustrates a capability . . . to move or copy an asset from any home, car, portable, computer, or other computing device." ('704 patent, 11:44-48) (emphasis added). Watermarking an asset for use on multiple media player devices would be superfluous if each media player device were required to download the asset from the portal. Furthermore, the plaintiff argues that dependent claims 8 and 9 provide support for its proposed construction. Claim 8 further limits claim 7 by requiring a media player device to upload a media asset to the virtual media access library portal before it may be downloaded from the portal to the other media player devices. Under Apple's proposed construction, claims 7 and 8 operate in the same manner. Next, claim 9 states that the media asset portability application moves the media assets from one media player device to another; no intermediate step of uploading to the virtual

media asset library is mentioned.  Thus, the specification and the claims disclose direct transfers of assets among media player devices.

Second, Apple asserts that each of the plurality of media player devices must have the media asset portability application, whereas Zapmedia contends that only or more, but not all, of the devices must have the application.  According to the plaintiff, claim 7 requires that the plurality include *a* media asset portability application; it does not refer to multiple applications or state that each asset must have an application.  Instead, Zapmedia argues that a single media player device with the media asset portability application may move or copy assets to other media player devices lacking the application.  In claim 8, the media asset portability application also posts assets to the virtual media asset library, but the claim language does not state that the application is required "for access by the other of the plurality of media player devices."  Thus, it is possible for the media asset portability application to run on only a single device and yet permit access by other devices not running the application.  Therefore, the court construes the term "the plurality of media player devices including a media asset portability application" to mean "two or more 'media player devices,' with at least one of the devices having software permitting a 'media asset' to be copied or moved."

**H.**   **"access the plurality of media assets . . . across the plurality of media player devices"**

This term is found in the '704 patent, claim 7: "the plurality of media player devices including a media asset portability application that enables the user to *access the plurality of media assets* referenced in the virtual media asset library *across the plurality of media player devices*." According to Zapmedia, this term means "retrieve, obtain or use two or more of the 'media assets,' which are designated in the 'virtual media asset library,' and which are crossing from one or more

18

'media player devices' to another one or more 'media player devices.'" Apple argues that this term should be construed as "each of a plurality of media player devices communicates with the portal to download or stream the referenced media assets for use."

In the term "the plurality of media player devices including a media asset portability application," construed *supra*, the court rejected Apple's arguments regarding the "each of" and portal communication restrictions. Therefore, the term "access the plurality of media assets . . . across the plurality of media player devices" is construed as "retrieve or obtain, including use, two or more of the 'media assets,' which are designated in the 'virtual media asset library,' from one or more 'media player devices' to another one or more 'media player devices.'"

### I.       "authorizing . . . a plurality of media player devices with the user account"

Claim 1 of the '414 patent contains the disputed term: "A method of managing access to a plurality of media assets comprising the steps of: *authorizing . . . a plurality of media player devices with the user account* . . . ." (emphasis added). The plaintiff argues that this term means "permitting two or more 'media player devices' with the 'user account.'" Alternatively, the plaintiff proposes the following definition: "specifying two or more media players in the user account, whereby referenced media assets can be copied and/or used by the aforementioned media players." On the other hand, the defendant asserts that this definition means "specifying a set of two or more permitted media players in the user account, whereby referenced/associated media assets can be copied and used exclusively by media players in the set."

The primary dispute is whether the authorized plurality of media player devices is the *exclusive* set of devices that may access the licensed media assets. Based upon the patents' prosecution history, Apple argues that only the authorized devices may access the licensed media assets. But in the term "the plurality of media player devices including a media asset portability

19

application," construed *supra*, the court rejected the defendant's argument that the patentees disclaimed watermarking and direct device-to-device transfer. The specification also explains, "[A] user may be granted the right to loan or forward his or her licensed media assets to another person that is not a registered user of the system. The forwarded asset is encapsulated in an executable file that allows for the object's integration into the recipient's media players . . . ." ('414 patent, 11:39-44). This language teaches the use of licensed media assets by non-authorized devices. As such, the court construes this term to mean "specifying two or more media players in the user account, whereby referenced media assets can be copied and/or used by the aforementioned media players."

###### J.     "network"

The term "network" is found in the '414 patent, claim 1: "A method of managing access to a plurality of media assets comprising the steps of: . . . authorizing over a *network* a plurality of media player devices with the user account . . . ." Networks are discussed in the following sentence from the specification: "The portal [] communicates with media player devices [] via communication network [] that may consist of the Internet and/or a combination of wireless communication networks, such as cellular networks, PCS networks, etc." ('704 patent, 3:48-51). Figure 2 also depicts "network(s)" as including 56KB, Cable, DSL, Satellite, and Wireless. Zapmedia's proposed definition is "the Internet alone or in combination with one or more communication networks." According to Apple, "network" means "a group of two or more computer systems linked together."

Zapmedia argues that the Internet is a necessary component of the "network," although other communications networks may be used in addition to the Internet. According to Zapmedia, the term "network" must include the Internet, as that is the only means for the portal to communicate with back-end systems and servers. But the claim language uses network in the context of communications between the media player devices and the portal / server, not between any other

components of the invention.  (*E.g.*, '414 patent, Fig. 2; claim 1 ("authorizing over a network a plurality of media player devices"); claim 4 ("a server application accessible over a network and capable of recognizing a plurality of media player devices")).  Thus, there is no need to construe the term to require use of the Internet.  As such, the court construes "network" to mean "one or more wired or wireless communication networks."

### K.       "accessed by any one of the authorized plurality of media player devices"

This term is located in claim 1 of the '414 patent: "A method of managing access to a plurality of media assets . . . wherein the plurality of referenced media assets can be *accessed by any one of the authorized plurality of media player devices*."  The plaintiff argues that this term means "retrieved, obtained or used by any of the 'media player devices' which are permitted to play said 'media assets.'"  Alternatively, the plaintiff contends that the proper construction is "retrieved or obtained, including for use, by any of the 'media player devices' which are permitted to play said 'media assets.'"  In contrast, the defendant's proposed definition is "each of a plurality of media player devices communicates with a portal to download or stream the associated media assets for use."  The parties' proposals differ in three main respects: direct communication between media player devices, definition of "access," and meaning of "any one."

First, Apple argues that "access" is limited to transfers to and from the portal.  But, in the term "the plurality of media player devices including a media asset portability application," construed *supra*, the court rejected Apple's prosecution history disclaimer argument regarding direct player-to-player communications.  Second, the defendant contends that "access" does not include use of the media asset.  According to Apple, the specification treats "use" and "access" as distinct and separate concepts, e.g., "*access* media assets *for use*." ('414 patent, 1:45-46) (emphasis added).  But the language "access . . . for use" indicates that use is subsumed within the broader access

21

function.  Third, Apple asserts that plain meaning "any one of" is that each media player must be capable of accessing media assets.  Apple provides the following example in support of its construction: "you can access Marshall by any [one] of these three roads" means simply that all three, not merely one, of the roads provide access to Marshall.  But Zapmedia argues that "any one of" does not mean "every one of"–it means "any of" or "one or more of."  The claim language, however, states that the "referenced media assets *can* be accessed by *any one* of the . . . media player devices."  (emphasis added).  The claim indicates that any one of the devices must be capable of accessing the media assets.  Therefore, the court construes the term "accessed by any one of the authorized plurality of media player devices" to mean "retrieved or obtained, including for use, by each of the authorized 'media player devices.'"

**L.**  **"the at least one authorized media player device to access one or more of the media assets associated with the user account"**

Claim 4 of the '414 patent contains the disputed term: "an application residing on at least one of the authorized plurality of media player devices and enabling *the at least one authorized media player device to access one or more of the media assets associated with the user account*."  Zapmedia argues that this term means "at least one 'authorized media player device' can retrieve, obtain or use one or more of the 'media assets' associated with the 'user account.'"  Alternatively, Zapmedia believes that this term should be construed as "at least one 'authorized media player device' can retrieve or obtain, including for use, one or more of the 'media assets' associated with the 'user account.'"  On the other hand, Apple asserts that the term means "each of a plurality of media player devices communicates with the server to download or stream the referenced media assets for use.  The court is persuaded that the plaintiff's construction is correct and thus construes the term "the at least one authorized media player device to access one or more of the media assets

associated with the user account" to mean "at least one 'authorized media player device' can retrieve or obtain, including for use, one or more of the 'media assets' associated with the 'user account.'"

## M.    Order of limitations

Zapmedia contends that the language of the '414 patent's claims 1 and 10 do not require any particular sequence of steps. Apple, on the other hand, believes that the claim limitations must be performed in a specific order. Claim 1 of the '414 patent states:

> A method of managing access to a plurality of media assets comprising the steps of:
> providing a user with a user account;
> storing references to a plurality of media assets which the user has a license to use; and
> authorizing over a network a plurality of media player devices with the user account, wherein the plurality of referenced media assets can be accessed by any one of the authorized plurality of media player devices.

Claim 10 reads:

> A method of managing access to a plurality of media assets comprising the steps of:
> providing a user with a user account;
> allowing the user to license a plurality of media assets;
> associating the licensed plurality of media assets with the user account;
> authorizing over a network a plurality of media player devices with the user account;
> providing access to at least one of the plurality of licensed media assets by any one of the plurality of authorized media player devices.

According to Apple, the user must obtain a license to a plurality of media assets before the storage of the claimed "references to" the media assets. Then, authorizing a plurality of media players must occur after the "providing a user account." Finally, the provision of access to the authorized media players must occur after multiple media players are authorized.

Generally, there is no presumption that the steps of a method claim must be performed in a particular order. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). But the claim language or statements in the specification may teach that the steps must be

23

performed in sequential order. *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998). In *Mantech Environmental*, the steps of the claim at issue were (a) providing wells, (b) providing a treating flow of acid from said wells, and (c) introducing an aqueous ferrous ion solution for mixing with said acidified groundwater. *Id.* at 1375 n.13. The Federal Circuit held that the plain language of the claim required the steps to be performed in order:

> Step (a) provides the wells. No monitoring or injecting of the groundwater can occur until wells are provided; hence, step (a) must be performed first. Step (b) introduces acetic acid, via the wells provided in step (a), into the groundwater of the contaminated region. Hence, in order to accomplish step (b), the wells of step (a) must already have been provided. Step (c) introduces an aqueous solution of ferrous ion into said groundwater region for mixing with "*said acidified groundwater.*" In order for the aqueous solution to mix with the acidified groundwater, the acid must have already mixed with the groundwater to form acidified groundwater. Hence step (b) necessarily comes before step (c).

*Id.* at 1375-76.

In the present case, step (a) of the '414 patent, claim 1 is "providing a user with a user account" and step (c) is "authorizing . . . a plurality of media player assets with the user account." Step (a) provides the user accounts, and a prerequisite for step (c) is the existence of a user account; therefore, step (a) must occur before step (c). Step (c) could only occur before step (a) if the "with the user account" language were read out of the claim. Step (b) is "storing references to a plurality fo media assets" and step (d) is "the plurality of referenced media assets can be accessed by any one of the authorized plurality of media devices." The two prerequisites of step (d) are referenced media assets, created in step (b), and an authorized plurality of media player devices, which are created in step (c). Thus, steps (b) and (c) must be performed before step (d). In summary, for claim 1 of the '414 patent, step (a) must occur before step (c), and steps (b) and (c) must occur before step (d).

For claim 10, step (c) is "associating the licensed plurality of media assets with the user account." The user account is provided in step (a) and the plurality of media assets are licensed in

step (b).  Step (d) is "authorizing . . . a plurality of media player devices with the user account," which requires the user account to be provided in step (a).  Step (e) is providing access to the licensed media assets by the authorized media player devices; media assets are licensed in step (b) and media player devices are authorized in step (d).  Therefore, steps (a) and (b) must occur before step (c), step (a) must occur before step (d), and steps (b) and (d) must occur before step (e).

## VI.    Conclusion

The court adopts the constructions set forth in this opinion for the disputed terms of the '414 and '704 patents.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 19th day of May, 2010.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE